# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

In Re:                                     )
                                           )      **JUDGE RICHARD L. SPEER**
Kevin/Kristine Durczynski                  )
                                           )      Case No. 08-37033
            Debtor(s)                      )
                                           )

## DECISION AND ORDER

This cause comes before the Court after a Hearing on the Motion of the United States Trustee to Dismiss Case for Abuse pursuant to 11 U.S.C. § 707(b)(1) and 11 U.S.C. § 707(b)(3). At the conclusion of the Hearing, the Court took the matter under advisement so as to afford time to thoroughly consider the issues raised by the Parties. The Court has now had this opportunity, and finds, for the reasons set forth herein, that the Motion of the United States Trustee should be conditionally Granted.

## LAW

In the matter before the Court, the United States Trustee ("UST") seeks to dismiss the Debtors' bankruptcy case. Matters concerning the dismissal of a case, which affects both the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(J)/(O). As a core proceeding, this Court has been conferred with the jurisdictional authority to enter a final order in this matter. 28 U.S.C. § 157(b)(1).

The Debtors, Kevin and Kristine Durcznski ("the Debtors"), submitted themselves to the jurisdiction of this Court by filing a petition under Chapter 7 of the United States Bankruptcy Code. In a Chapter 7 bankruptcy case, an "individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets." *Schultz v.*

*U.S.*, 529 F.3d 343, 346 (6th Cir. 2008). In this case, the trustee appointed to administer the debtor's bankruptcy estate filed a report, setting forth that after a "diligent inquiry into the financial affairs" of the Debtors "there is no property available for distribution from the estate over and above that exempted by law." (Doc. No. 11). Accordingly, in this matter, if the Debtors' case is not dismissed, and allowed to proceed to discharge, the Debtors' unsecured creditors will not receive any remuneration, while the Debtors will receive a discharge of their personal liability on all of their dischargeable debts.

As the statutory basis for its Motion to Dismiss, the UST cites to 11 U.S.C. § 707(b)(1) and § 707(b)(3). These two provisions operate together in a hierarchical fashion, with § 707(b)(1) first setting forth the foundational requirement, providing for dismissal when the filing of the case is found to be abusive. Section § 707(b)(3) then provides a methodology by which to assess the existence of abuse under § 707(b)(1). In relevant part, these provisions provide:

> (b)(1) After notice and a hearing, the court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter.
>
> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider–
>
>> (A) whether the debtor filed the petition in bad faith; or
>>
>> (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

In seeking to have the Debtors' case dismissed in accordance with these provisions, the UST did not make any allegations of "bad faith" pursuant to § 707(b)(3)(A), but instead sought dismissal based solely on the methodology contained in § 707(b)(3)(B): the totality of the Debtors' financial

Page 2

circumstances. In taking this position, the UST set forth that the Debtors "have the ability to repay their creditors out of their current income."

It has been Congressional policy toward the Bankruptcy Code to encourage debtors to repay their debts. *See, e.g.*, *In re Copper*, 426 F.3d 810, 814 (6th Cir. 2005) (observing that the rationale for readily granting conversion under § 706 is to encourage debtors to repay their debts). It has also been Congressional policy to limit bankruptcy relief to those debtors truly in "need" of such relief. *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989).

Consistent with these policies, a debtor's ability to repay their unsecured debts has developed to become a prime, and often dispositive consideration when determining whether, under the 'totality of the circumstances standard of § 707(b)(3)(B), a case should be dismissed for abuse. *In re Masella*, 373 B.R. 514, 518 (Bankr. N.D.Ohio 2007). A frequently utilized measure, when determining whether a debtor has the ability to repay their debts, is to ascertain whether, under a hypothetical Chapter 13 repayment plan, the debtor could repay a meaningful percentage of his or her unsecured debts. *In re Behlke*, 358 F.3d 429, 434-35 (6th Cir. 2004). The burden of proof to support dismissal based upon § 707(b)(3)'s 'totality of the circumstances' standard, and a debtor's ability to pay, is upon the movant, the UST. *In re Baker*, 400 B.R. 594, 597 (Bankr. N.D.Ohio 2009).

## BACKGROUND

The total amount of debt subject to discharge in this case, as reported by the Debtors, is $340,538.74, representing $228,760.54 in secured obligations and $111,778.20 in unsecured, nonpriority debt. (Doc. No. 1). Most of the Debtors' unsecured debt stems from credit-card transactions. The Debtors' secured debt is compromised of two obligations, both against their residence: a first mortgage in the amount of $180,000.00; and a second mortgage of $48,760.54. This

Page 3

residence was built by the Debtors at a cost of $238,000.00, with the Debtors placing a present value on their residence of $250,000.00.

The Debtors indicated that they intend to reaffirm on the obligations secured against their residence so as to enable them to retain the property. A central point of the Motion of the UST goes to this intention. In its arguments to the Court, it is the position of the UST that the Debtors' intent to retain their current residence, by necessitating the continued payment of the secured obligations, constitutes an improper allocation of their financial resources, – resources which could otherwise be utilized to pay their unsecured creditors. Presently, to service the monthly obligations associated with their residence, the Debtors allocate $2,187.21, representing $1,698.00 for the first mortgage as well as payments for taxes and insurances; and $489.21, representing the second mortgage payment. This figure is exclusive of an additional monthly expense of $390.00 for utilities.

In addition to their residence, the UST also pointed to a couple of other aspects of the Debtors' financial situation. First, while their income has experienced some fluctuations, the Debtors have consistently maintained a gross yearly income level of $100,000.00. This income is derived entirely from the Debtors' employment: Mr. Durczynski, as a mechanical operator with Chrysler, earns a gross monthly income of 4,658.32; Mrs. Durczynski, as a registered nurse, earns a gross monthly income of $2,948.90.

Second, the UST, took issue with the amount of monthly disposable income that the Debtors claim they have available. In their figures presented to the Court, the Debtors claimed that, after necessary expenses, they only had $28.14 in excess income available each month to pay their unsecured creditors. This figure was based upon a net monthly income figure for the Debtors of $5,585.35, and necessary, monthly expenses of $5,557.21. The UST, however, pointed out that the Debtors' expenses included a monthly allocation for food in the amount $1,150.00, which it deemed

Page 4

to be excessive. The UST also pointed out that in the past the Debtors have received tax refunds –
i.e., $2,729.83 for 2007, $3,286.17 for 2008 – which should be counted as income. (Ex. A & B).


### DISCUSSION

All the points raised by the UST are well founded in law. On the first point, regarding the Debtors' home, this Court has not viewed favorably debtors who seek to maintain expensive homes or vehicles while simultaneously seeking to discharge their voluntarily incurred unsecured obligations. As previously noted by the Court, bankruptcy is "meant to provide a debtor a fresh-start, but not a head start. Thus, when seeking bankruptcy relief, debtors may be expected to do some belt tightening, including, where necessary, foregoing the reaffirmation of those secured debts which are not reasonably necessary for the maintenance and support of the debtor and his family." *In re Wadsworth*, 383 B.R. 330 (Bankr. N.D.Ohio 2007) (internal citations omitted).

In this matter, the Debtors devote a significant amount of their income to maintain their home. To service the necessary obligations attendant with their home, the Debtors must allocate $2,187.21 from their monthly budget. This figure constitutes approximately 40% percent of the Debtors' net monthly income of $5,585.35. It is also 2 ½ times the amount that is allowed under the 'means test' formulation of § 707(b)(2). At the time the Debtors filed their bankruptcy petition, the allowable monthly mortgage expense for a family of five when applying the 'means test' of § 707(b)(2) was $888.00.[1]

---

[1]
http://www.usdoj.gov/ust/eo/bapcpa/20081001/bci_data/housing_charts/irs_housing_charts_OH.htm.

Page 5

While the 'means test' of § 707(b)(2) is not strictly applicable in this case, its standards do serve to show that a significant portion of the expenses associated with the Debtors' residence are not necessary for their basic living needs, but instead constitute a "lifestyle" choice. The 'means test' formula of § 707(b)(2) is derived from the standards set by the Internal Revenue Service for debt collection. Under these standards, expenses allowable as a deduction against income – of which there are three categories, denominated National Standards, Local Standards and Other Expenses – are defined so as to allow a debtor those reasonable "expenses that are necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income." I.R.M. § 5.15.1.7 (Allowable Expense Overview, 05-09-2008). The Debtors' residence goes well beyond that which is necessary to provide for their basic needs.

In this geographic area, a $250,000.00 residence, such as that owned by the Debtors, while not necessarily ostentatious, is well above the norm of that owned by other debtors who come before the Court. *In re Voelkel*, 322 B.R. 138, 147 (9th Cir. B.A.P. 2005). (a court can rely on its own judgments to identify excessive expenses and can draw on its own experience generally or specifically within the geographic area where the debtor resides). Capturing this aspect of the Debtors' residence is this fact: Within the past few years, the Debtors spent a significant sum of money, over $20,000.00, to have a pool and its attendant accouterments constructed on their property.

The Court also agrees with the UST that there is some slack in the Debtors' monthly budget. Particularly, while the Debtors do have three children, ages 17, 13, and 10, the allocation of $1,150,00 per month for food seems moderately excessive. It also goes without saying that any expenses associated with the Debtors' pool, which they acknowledged costs $400.00 per year, are not necessary. *In re Shaw*, 311 B.R. 180, 184 (Bankr. M.D.N.C. 2003) (ongoing expenses for a swimming pool are not reasonably necessary expenses).

Page 6

Additionally, on the income side of the equation, future tax refunds received by the Debtors, which in the past couple of years have averaged around $3,000.00, constitute a source of income which could be utilized by the Debtors to pay their unsecured debts. As this Court explained: "Tax refunds arise as the result of a taxpayer's overpayment of their tax liability." *In re Blankenship*, 398 B.R. 457, 462 (Bankr. N.D.Ohio 2008). Therefore, "tax refunds, although not available on a monthly basis, are a source of income for a debtor" and "so long as there is the realistic prospect of similar refunds in the future, tax refunds will be included in a determination of the Debtor's net income for purposes of § 707(b)." *Id.*

The Debtors counter these points by noting that their income is not secure, especially with regards to Mr. Durczynski who, as an employee with Chrysler, recently experienced a layoff from his employment and who may experience more of the same in the future given the current state of the auto industry. In addition, the Debtors argue that their home, while it may be above average, is still firmly planted in the middle class, and thus they should not be penalized for seeking to retain their residence.

On the first point, the Court is not receptive of the argument that the possibility of a future downturn in one's economic affairs should operate to insulate debtors, with the ability to pay their debts, from the reach of § 707(b)(3). If such a downturn should come to pass, the Bankruptcy Code affords a debtor ample remedial measures. For example, if a debtor's case is dismissed, nothing prevents a debtor from again seeking bankruptcy relief under Chapter 7. Similarly, if a debtor pursues bankruptcy relief under the context of a Chapter 13, a debtor is still afforded the right to later seek the conversion of their case to one under Chapter 7, to modify their plan, or to seek a hardship discharge of their debts. See 11 U.S.C. §§ 1307(a), 1328(b) & 1329(a). The second point raised by the Debtors is more complex.

The purchase of a home is a highly personal choice and is one which requires debtors to assess not only the present needs of their family, but also their long term needs. *In re Kitson*, 65 B.R. 615, 620-21 (Bankr. E.D.N.C.,1986). Debtors may, therefore, be afforded some latitude in their choice of a home which as opposed to a purely financial decision – for example, whether to purchase cable television – involves a moral and value based judgment on the part of the debtor. Notwithstanding, assessing a debtor's ability to pay for purposes of § 707(b)(3) still requires that a court scrutinize a debtor's expenses. It, thus, cannot be avoided that an 'ability to pay' inquiry under § 707(b)(3) may encroach on the highly personal choices that all individuals make about how to prioritize their expenses and, on more basic level, how to live their lives. *In re Fauntleroy*, 311 B.R. 730, 736 (Bankr. E.D.N.C. 2004).

Within this context, it is fair to state that the more an expense involves a moral and value based judgment on the part of the debtor, the more deference that will be accorded to the debtor's decision. Conversely, the more a decision is purely financial in character, the more scrutiny that will be accorded to that decision. For example, the decision to have a child, while undoubtably having a financial component, is largely a moral decision, and thus it would be highly unusual for such a decision to have a negative impact on a debtor in a § 707(b)(3) analysis. In fact, deference to the debtor's decision to have a child may be constitutionally required. *In re Edwards*, 50 B.R. 933, 940 fn. 9 (Bankr. S.D.N.Y. 1985). On the other hand, a debtor's decision involving cable television, being largely a financial-based decision, would not be accorded much deference.

In this matter, the Court can only conclude that the Debtors' intention to retain their residence arises more from "want" as opposed to any "need." For example, no evidence was provided that the education or health of the Debtors' children would be impacted if they did not stay in their current residence. Also, the Debtors have been able to add amenities to their residence – particularly, the swimming pool – which, although making the retention of the residence desirable, cannot be viewed

Page 8

as a necessity. Resultantly, the Debtors' intention to retain their residence does not resemble a moral or value based judgment, but rather a financial-based decision.

To be sure, the Debtors' have an emotional attachment to their home. However, while this is understandable, it does not justify overlooking the overall state of the Debtors' financial situation. *In re DeRosear*, 265 B.R. 196, 218 (Bankr. S.D.Iowa 2001). First, the Debtors have an appreciable amount of income available to pay their debts, with the Debtors having a combined annual salary of approximately $100,000.00. In this way, this Court has previously observed: "Under any measure, a debtor, having a stable annual salary of almost $100,000.00, will be hard pressed to establish that they do not have the ability to pay some of their unsecured debt, such as through funding a Chapter 13 plan of reorganization." *In re Wadsworth*, 383 B.R. 330, 334 (Bankr.N.D.Ohio 2007).

Additionally, as already pointed out, the Debtors presently devote a significant portion of their income to maintain the costs associated with their residence. Furthermore, as explained, the Debtors could reduce these costs, thereby freeing resources that could be devoted to pay their debts, without depriving themselves and their family of adequate shelter. Finally, the Debtors' current monthly budget, having overstated some expenses and having omitted future tax refunds from the calculation, is not entirely reflective of their financial situation.

Given this situation, the Court finds it hard to reconcile the Debtors' plea that they do not have the ability to pay their voluntarily incurred debts against the Debtors' desire to retain a $250,000.00 home with a swimming pool. Further pushing toward the existence of abuse in this case are these additional evidentiary points which show that the Debtors' financial situation, far from arising from unforeseen events, is the result of circumstances reasonably within their control. *See Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 437 (6th Cir. 2004) (factor for determining dismissal under § 707(b) may include whether debtor's financial situation is the result of an unforeseen or catastrophic event); *In re Krohn*, 886 F.2d 123, 128 (6th Cir.1989).

Page 9

First, the Debtors are young and, while they have three children, neither of the Debtors has any significant health issue(s) which would inhibit their continuing ability to earn a living. Second, Mrs. Durczynski has not made a concerted effort to maximize her income, with the evidence showing that she has the ability to increase her income significantly, perhaps by 20% to 30%, if she were to work full time. In fact, Mrs. Durczynski testified that, despite the ability to work full time, she has chosen to work part time, not out of necessity, but for the reason that the particular position she seeks – pediatric nursing on a day shift – is not currently available. Finally, nearly all of the Debtors' unsecured obligations are the result of credit-card transactions.

In conclusion, the Court, although it can appreciate the Debtors' desire to retain a home with extra amenities, is not convinced that servicing the full amount of the expenses associated with their property qualifies as a necessary expenditure. The Debtors have also under-represented the amount of income available to them, with the Debtors claiming an expenditure for food which is excessive. Additionally, the available income represented by the Debtors fails to adequately take into account tax overpayments. Consequently, for these reasons, and for those other reasons set forth herein, it is the decision of this Court that granting the Debtors relief in this bankruptcy case would constitute an abuse within the meaning of § 707(b)(1) and 11 U.S.C. § 707(b)(3). *See In re Lubinski*, Case No. 07-31230, 2008 WL 2388127 (Bankr. N.D.Ohio 2008) (J. Whipple) (finding abuse where debtor's intended to reaffirm on a $240,000.00 home with a swimming pool where the mortgage expenses totaled $2,501.00, constituting nearly 43% of debtor's net monthly income).

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Kevin/Kristine Durczynski
Case No. 08-37033

Accordingly, it is

**ORDERED** that, subject to the Debtors' election to convert this case, the Motion of the United States Trustee to Dismiss under 11 U.S.C. § 707(b)(1) and § 707(b)(3), be, and is hereby, GRANTED.

**IT IS FURTHER ORDERED** that the Clerk, United States Bankruptcy Court, is directed to prepare for presentation to the Court an order of dismissal under 11 U.S.C. § 707(b)(1) if, at the opening of business on Friday, May 15, 2009, this case is still proceeding under Chapter 7 of the United States Bankruptcy Code.

Dated: April 29, 2009

Richard L. Speer
United States
Bankruptcy Judge

Page 11

# CERTIFICATE OF SERVICE

Copies were mailed this 29th day of April 2009 to:

Elizabeth Alphin
801 W Jefferson St
Louisville, KY 40202

Kevin R. Durczynski
3927 Yeager Way
Oregon, OH 43616-3458

Kristine M. Durczynski
3927 Yeager Way
Oregon, OH 43616-3458

Gordon R Barry
930 Spitzer Bldg
Toledo, OH 43604

ECAST SETTLEMENT CORPORATION
POB 35480
NEWARK, NJ 07193-5480

Gilbert B Weisman
c/o Becket & Lee
PO Box 3001
Malvern, PA 19355

John N Graham
5151 Monroe St
#245
Toledo, OH 43623

HSBC Bank Nevada, N.A.
Bass & Associates, P.C.
3936 E. Ft. Lowell Road, Suite #200
Tucson, AZ 85712

Patti H. Bass
3936 E. Ft. Lowell Rd. #200
Tucson, AZ 85712

Dean Wyman ust03
Office of the US Trustee
201 Superior Avenue, Suite 441
Cleveland, Oh 44114-1240

/s/Jennifer S Huff
Deputy Clerk, U.S. Bankruptcy Court